IN THE
UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BEINS, AXELROD, P.C.,<br>1717 K St. NW<br>Suite 1120<br>Washington DC 20006 | )<br>)<br>)<br>)<br>) | 19-cv-3794-JEB |
| Plaintiff, | )<br>) | |
| v. | )<br>) | |
| ANALYTICS, LLC<br>18675 Lake Drive East<br>Chanhassen, MN 55317 | )<br>)<br>)<br>) | |
| and | )<br>) | |
| MCTIGUE LAW LLP<br>4530 Wisconsin Ave., NW<br>Suite 300<br>Washington, DC 20016 | )<br>)<br>)<br>)<br>) | |
| and | )<br>) | |
| THE HARTFORD<br>3600 Weisman Blvd.<br>San Antonio, TX 78251 | )<br>)<br>)<br>) | |
| and | )<br>) | |
| CITIGROUP, INC.<br>d/b/a Citibank<br>1209 Orange Street<br>Wilmington DE 19801 | )<br>)<br>)<br>)<br>) | |
| and | )<br>) | |
| JOHN DOE<br>Address unknown, | )<br>)<br>) | |
| Defendants. | ) | |

# COMPLAINT

## Parties

1. Plaintiff Beins, Axelrod, P.C. (hereinafter "Beins firm ") is a Professional Corporation organized under the laws of the District of Columbia.

2. Plaintiff is engaged in the practice of law.

3. Defendant Analytics LLC is based in Minnesota and provides class action management services nationwide.

4. Defendant McTigue Law LLP is a law firm based in the District of Columbia.

5. Defendant The Hartford Insurance is an insurance provider.

6. Defendant Citigroup, Inc., d/b/a Citibank is a financial institution that is insured by the Federal Deposit Insurance Corporation.

7. Defendant Doe is an individual or group of individuals that used electronic means to intercept and re-direct e-mail messages to and from the Beins firm. The only identifying information known about Doe is that he/she used the e-mail address svp@izlix.com to infiltrate at least one computer at the Beins firm.

## Jurisdiction

8. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 as at least one of the claims arises under a federal statute.

9. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

10. This Court has specific personal jurisdiction over Defendant Analytics because of its obligation to disburse funds to DC based law firms, the disbursement of which is the core of the facts of this case.

11. This Court has specific personal jurisdiction over Defendant McTigue Law LLP because its office is in the District of Columbia.

12. This Court has specific personal jurisdiction over Defendant The Hartford because it entered into the contractual arrangement that forms the basis for one of the Counts in this Complaint.

13. This Court has general personal jurisdiction over Defendant Citibank because it does substantial business in the District of Columbia. It has approximately nine consumer banking branches in the District.

14. When Defendant John Doe is identified, the Court will have specific personal jurisdiction over Doe because Doe unlawfully accessed a computer in the District.

**Facts**

15. The Beins firm provided legal services in connection with the class action lawsuit *Carver et al v. Bank of New York Mellon et al*, Civil Action No. 1:15-cv-10180-JPO-JLC ("Carver ADR/FX") in the United States District Court for the Southern District of New York. ("New York court").  The Complaint alleged that the Bank had breached its obligations to a class of pension funds covered by the Employee Retirement Income Security Act ("ERISA").

16. Jonathan G. Axelrod is, and has been at all times relevant to this proceeding, the managing shareholder of the Beins firm.

17. McTigue Law, LLP, is a law firm in Washington, D.C., that also provided legal services in that case. J. Brian McTigue is a partner in the McTigue firm.

18. Ciresi Conlin LLP is a law firm based in Minnesota that also provided legal services in that case. Barry Landy is a partner in that firm.

19. The Beins firm, the McTigue firm, and Ciresi Conlon all represented the Plaintiffs' class in the Carver/ADR FX case.

20. In or around December 2018, the *Carver* case settled before trial. The Court approved a settlement agreement that provided, in pertinent part, the distribution of approximately $12,500,000 to the plaintiff pension funds and a total of $5,966,250 in legal fees and costs to the law firms representing the Plaintiffs.

21. Counsel for the Plaintiffs and Defendants in the Carver case hired Analytics LLC to distribute the damages awarded to the pension funds and the attorney fees and costs awarded to Plaintiffs' counsel.

22. After the case was settled between Plaintiffs and Defendants, the law firms representing the Plaintiff class, primarily the McTigue firm and the Ciresi Conlin firm, had disagreement about the apportionment among them of the total amount awarded. There was no dispute concerning the amount due the Beins firm, but there was agreement that no firm would be paid until the fee allocation was resolved.

23. The McTigue firm and Ciresi Conlin continued to negotiate that apportionment, eventually reaching an agreement in early July 2019.

24. The Beins firm did not participate in those negotiations because the other firms were not disputing the amount of the award to which the Beins firm was entitled.

25. The Beins firm did not become aware until July 20, 2019, that the dispute over apportionment of fees had been resolved.

26. The amount of money to be dispersed to the various firms totaled approximately $5,966,250.

27. Plaintiff's share of the fees award was $60,354.67.

28. McTigue's share of the fees award was $2,237,904.32.

29. The remainder of the fees award was the Ciresi Conlon share.

30. On July 16, 2019, at 5:55 PM, McTigue sent an e-mail to Jon Axelrod, managing partner of the Beins firm. That e-mail is attached hereto as Exhibit A to the Complaint. In that e-mail, McTigue stated, "Jon I know you changed addresses. Give me your wire transfer information to which to wire funds."

31. On July 17, 2019, at 10:32 AM, Axelrod sent a reply e-mail to McTigue giving him the information needed to wire the funds to Beins, Axelrod, PC's Eagle Bank account. That e-mail is attached hereto as Exhibit B to the Complaint.

32. Axelrod understood McTigue's July 16th e-mail to be in reference to an approximately $8,000 payment McTigue owed the Beins firm for a completely unrelated case (the "Local 96" case), because the two of them had been discussing that matter and the money the McTigue firm owed to the Beins firm in connection with that case in the days prior to July 16th.

33. Meanwhile, unbeknownst to the Beins firm, the dispute over the fees in the Carver/ADR FX case had been resolved.

34. On July 17, 2019, at 2:36 PM, Landy from Ciresi Conlon sent an e-mail to Richard Simmons of Analytics. That e-mail is attached hereto as Exhibit C to the Complaint. Landy did not copy the e-mail to Axelrod or anyone else at the Beins firm.

35. Although the e-mail in Exhibit C was sent from Landy's e-mail address, it was jointly signed by McTigue and Landy and was cc'd to McTigue. That e-mail was not cc'd to Axelrod.

36. Neither McTigue nor Landy were authorized to act on behalf of the Beins firm.

37. The e-mail in Exhibit C instructed Analytics to distribute specific amounts of money to various law firms, including McTigue's firm and the Beins firm. It also included bank routing and account information for each recipient firm. It included the Eagle Bank information for the Beins firm.

38. At all times since at least as far back as 2015, the Beins firm has only had bank accounts with Eagle Bank.

39. On July 17, 2019, at 3:14 PM, an e-mail appearing to be from Axelrod was sent to McTigue stating "So sorry about the mix up. Use the account below instead of the one sent earlier." It then listed bank account information for a Citibank account. That e-mail is attached hereto as Exhibit D to the Complaint.

40. McTigue received the e-mail in Exhibit D.

41. Axelrod did not send the e-mail in Exhibit D and did not know that it had been sent until several days thereafter.

42. On July 17, 2019, at 3:20 PM, McTigue e-mailed Simmons, cc'd to Landy, stating that Axelrod had "yesterday sent me his old wire transfer instructions." In that e-mail, McTigue then gave Simmons (from Analytics) the Citibank account information. A copy of that e-

6

mail is attached hereto as Exhibit E to the Complaint. McTigue did not cc Axelrod on that e-mail either.

43. Neither McTigue nor Analytics contacted Axelrod concerning the alleged change in bank information.

44. As of the close of business on July 18, 2019, Axelrod still did not know the Carver/ADR FX dispute had been resolved, did not know that the $60,354.67 payment was being sent by Analytics to the Beins firm, and did not know that inaccurate bank account information had been given to McTigue.

45. On July 18, 2019, at 5:24 PM, Axelrod e-mailed McTigue, with a subject line "Local 96." That e-mail is attached hereto as Exhibit F to the Complaint.

46. In the e-mail in Exhibit F, Axelrod stated, "When can we expect the wire? I can pick up a check tomorrow afternoon or the weekend." At that time, Axelrod believed that any communications he was having with McTigue that week were related to the fees McTigue owed the Beins firm for the Local 96 matter.

47. Axelrod knew that the Beins Axelrod share of the Carver/ADR FX fees had been previously agreed on and that the hold up to payment was that Ciresi and McTigue could not agree on a how much each of their firms were entitled to from the fund of attorneys' fees. For that reason, Axelrod did not participate in the ongoing discussions between McTigue and Ciresi.

48. Axelrod never gave McTigue authority to speak on Beins, Axelrod, P.C.'s behalf in connection with the payment of the fees.

49. On July 18, 2019, at 7:08 PM, McTigue e-mailed back to Axelrod stating, "I thought the wire was paid today. It is for the ADR FX settlement. When you come here tomorrow or

Monday I will give you a check for the $8,011.12 for the Local 96 work." That e-mail is attached hereto as Exhibit G to the Complaint. "ADR FX settlement" is a reference to the Carver case. Axelrod did not see that e-mail for at least another day.

50. On the morning of Friday, July 19, 2019, Axelrod telephoned McTigue to ask about the $8,000 from the Local 96 matter. At that time, McTigue stated that he had wired that money to the Citibank account.

51. Axelrod replied that he had no idea what Citibank account McTigue was referring to. McTigue replied, "The one you listed in your e-mail the other day to send the money to."

52. Axelrod stated that the information about a Citibank account must have been the work of a hacker. McTigue stated he would call his bank immediately and try to have the $8,000 payment pulled back.

53. On that same phone call, McTigue then informed Axelrod that the Carver/ADR FX money had also been wired to the Citibank account. That was the first Axelrod became aware that money was coming from the Carver/ADR FX settlement.

54. Prior to the July 19, 2019, phone call, McTigue had not told Axelrod that the fee dispute had been settled. McTigue's forwarding of Beins, Axelrod, P.C.'s real or purported bank account information was without Axelrod's knowledge or authority.

55. McTigue promptly forwarded to Axelrod the e-mails that McTigue had received instructing him to send money to a Citibank account.

56. Axelrod took the printed e-mail to the Citibank branch office located in the same building as the Beins firm.

57. The Citibank teller confirmed that the bank did have an account with that number and that no money was in it. Axelrod asked if the records reflected receipt of the approximately $60,000 wire transfer. The teller refused to answer that question.

58. Also on July 17, Axelrod and McTigue spoke with Lisa Simmons at Analytics concerning the wire transfer. Axelrod asked Simmons if Analytics had any way of retracting the wire transfer. Simmons indicated that she could not do so and faxed him a screenshot verification of the wire transfer that went to the Citibank account. She said that she would contact the Citibank fraud department.

59. Thereafter, Axelrod learned that his e-mail account had been hacked. In researching the problem, Axelrod found that someone had installed an "Alert/Rule" on his e-mail account that re-directed any e-mails with McTigue to be forwarded to svp@izlix.com and then move the original message to Axelrod's deleted items folder. A screenshot showing that "Alert/Rule" is attached hereto as Exhibit H to the Complaint.

60. Axelrod promptly filed a criminal complaint on the Internet Crime Complaint Center. A copy of that submission is attached hereto as Exhibit I. As of this date, no law enforcement or other government agency has contacted him or the Beins firm about the matter.

61. On or around July 22, 2019, the Beins firm filed an insurance claim with its insurer, The Hartford. The claim was filed by phone call from Axelrod to The Hartford.

62. A copy of the Beins firm's policy with The Hartford is attached hereto as Exhibit J to the Complaint.

63. On August 23, 2019, The Hartford denied the insurance claim. A copy of that denial is attached hereto as Exhibit K to the Complaint.

## Count I- Computer Fraud & Abuse Act (Citigroup Inc. and Doe)

64. Each of the preceding allegations are incorporated as if fully restated herein.

65. 18 U.S.C. §1030(a)(4) states, "Whoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;"

66. 18 U.S.C. §1030(a)(5)(C) states, "Whoever intentionally accesses a protected computer without authorization, and as a result of such conduct causes damage and loss…shall be punished as provided in subsection (c) of this section."

67. 18 U.S.C. §1030(b) states, "Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provide in subsection (c) of this section.

68. Axelrod's computer was a "protected computer" as defined by 18 U.S.C. §1030(e)(1) and (2)(B).

69. 18 U.S.C. §1030(g) states, "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of

the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware."

70. The allegations set forth above, insofar as they describe conduct by Defendant Doe, fit within the conduct described in 18 U.S.C. §1030(c)(4)(A)(i)(I). Defendant Doe violated the Computer Fraud and Abuse Act.

71. Defendant Citibank aided and abetted the unlawful conduct of Defendant Doe, and as such is a conspirator in Defendant Doe's unlawful conduct.

### Count II- Negligence (Analytics LLC)

72. Each of the preceding allegations are incorporated as if fully restated herein.

73. Analytics assumed a duty of care towards the Plaintiff to responsibly handle the money that was eventually due to Plaintiff.

74. Analytics breached that duty when it negligently relied on the information provided by McTigue, even though Axelrod had never given Analytics permission to rely on McTigue to speak or act on behalf of Beins, Axelrod, P.C.

75. As a company that specializes in the proper handling and disbursement of escrowed funds, Analytics had a duty to follow up directly with the Beins firm to verify the proper wire transfer information.

76. Particularly in this age of electronic crime, a company that provides services that Analytics provides has a duty to show more diligence as to where it sends money than it exercised in this situation.

77. Analytics was also negligent in that it relied on bank account information that had been sent over a non-secure e-mail system.

78. Analytics' negligence as described above was a proximate cause of the Beins firm's losses.

### Count III- Fraud & Negligence (McTigue Law LLP)

79. Each of the preceding allegations are incorporated as if fully set forth herein.

80. McTigue Law LLP acted fraudulently when he held himself out to Ciresi and Analytics as having authority to direct where to send money that belonged to Beins, Axelrod, P.C.

81. Once McTigue Law LLP fraudulently held itself out as having the authority described above, it assumed a duty of care when it handled the communication with Ciresi and Analytics regarding funds that legally belonged to the Beins firm.

82. McTigue Law LLP negligently breached that duty when it failed to take the minute it would have taken to call Axelrod to verify the change in bank information

83. McTigue Law LLP's fraud and negligence described above was a proximate cause of the Beins firm's losses.

### Count IV- Breach of Contract (Analytics LLC)

84. Each of the preceding allegations are incorporated as if fully restated herein.

85. On information and belief, Analytics had a contractual arrangement with one or more of the firms involved in the disbursement of proceeds from the Carver/ADR FX settlement.

86. That included a contractual obligation to deliver the appropriate amounts of funds to the appropriate recipients, including the $60,354.67 to the Beins firm.

87. Analytics has breached that contractual obligation as it has not effected that delivery.

88. The Beins firm was a third-party beneficiary of Analytics' contract with the other firm(s).

89. The Beins firm has the right under the common law of the District of Columbia to enforce that contractual right.

### Count V- Breach of Contract (The Hartford)

90. Each of the preceding allegations are incorporated as if fully restated herein.

91. The insurance policy (hereinafter "policy") between The Hartford and the Beins firm is a contract enforceable under the common law of the District of Columbia.

92. There are several provisions of the policy that provide varying levels of coverage for the losses suffered by the Plaintiff.

93. The policy includes a five page section labeled as "Form SS 00 02 12 06" and titled "Spectrum Policy Declarations." That section is attached hereto as Exhibit L to the Complaint.

94. The Spectrum Policy Declarations portion of the policy provides, subject to a $250 per occurrence deductible, $5,000 in coverage for "money and securities…outside the premises."

95. The only reasonable way to interpret the coverage provision for "money and securities…outside the premises" is that it covers money that belongs to the insured but is stolen outside the insured's premises.

96. The $60,354.67 that was stolen by Defendant Doe was money to which the Beins firm had a legal right but that was stolen before it reached the Beins firm's physical premises.

97. As such, the Spectrum Policy Declarations portion of the policy requires The Hartford to provide $5,000 coverage subject to a $250 deductible.

98. The policy includes a 25 page section labeled "Form SS 00 07 07 05" and titled "Special Property Coverage Form." A copy of that section is attached hereto as Exhibit M to the Complaint.

99. The Special Property Coverage Form, at Section A.6.a(1)(a) states that the policy will pay for "All amounts due from your customers that you are unable to collect…that result from direct physical loss of or physical damage to your records of accounts receivable."

100. That provision would apply to this theft in that the stolen money was due from customers (by way of court ordered attorneys fees) that the Beins Firm is unable to collect due to the damage caused by Defendant Doe (and others) to the electronic records of the Beins Firm that were intended to facilitate collection of those fees.

101. The coverage set forth in Form SS 00 07 07 05 is limited to $25,000.

102. Section A.5.i. states that The Hartford "will pay for loss of 'money' used in your business while at a bank or savings institution…"

103. The money that was stolen from the Beins firm was stolen while in transit from Analytics LLC to the Beins firm and/or the Beins firm's bank accounts. As such, the policy covers that loss up to at least $25,000.

104. The policy includes a one page section labeled "Form SS 04 39 07 05" and titled "Accounts Receivable." A copy of that section is attached hereto as Exhibit N to the Complaint.

105. Although this section does not on its own change substantive terms of coverage, Form SS 04 74 09 07, titled "Super Stretch", at Section A.1.a. references Form SS 04 39

07 05 and in conjunction with that Form increases the coverage for lost Accounts Receivable to $150,000 per occurrence.

106. Thus, the coverage described in Form SS 00 07 07 05, "Special Property Coverage Form" has a limit of $150,000 per occurrence instead of $25,000.

107. In refusing to pay the claim, The Hartford has breached several provisions of the contract between it and the Beins firm.

WHEREFORE, Plaintiff Beins, Axelrod, P.C. demands judgment as follows:

a. Defendants be held jointly and severally liable for economic monetary damages of $60,354.67;

b. Defendants be held jointly and severally liable for litigation costs;

c. Defendants be held jointly and severally liable for reasonable attorneys' fees incurred in this matter;

d. Defendants Analytics LLC & McTigue Law LLP be ordered to pay punitive damages for its negligence in an amount determined by the jury;

e. Defendants be held jointly and severally liable for post-judgment interest on the compensatory damages set forth above.

A jury trial is demanded on all counts.

Respectfully submitted,

_____/s/_____
Justin P. Keating (DC Bar #475602)
Beins, Axelrod, P.C.
1717 K St. NW
Suite 1120
Washington DC 20006
jkeating@beinsaxelrod.com
O- 202.328.7222
F- 202.328.7030

**COUNSEL FOR PLAINTIFF**